UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS BURKETT, derivatively on behalf of SATCON TECHNOLOGY CORPORATION, | ) ) ) | |
| | ) | Civil Action No. 11-11379 |
| Plaintiff, | ) | |
| | ) | **VERIFIED AMENDED** |
| v. | ) | **SHAREHOLDER DERIVATIVE** |
| | ) | **COMPLAINT** |
| CHARLES S. RHOADES, JOHN M. | ) | |
| CARROLL, PHILIP J. DEUTCH, DANIEL R. | ) | **DEMAND FOR JURY TRIAL** |
| DWIGHT, JAMES L. KIRTLEY, JR., DAVID | ) | |
| J. PREND, AND ROBERT G. | ) | |
| SCHOENBERGER, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SATCON TECHNOLOGY CORPORATION, | ) | |
| | ) | |
| Nominal | | |
| Defendant. | | |

**VERIFIED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Thomas Burkett, by and through his undersigned attorneys, brings this action

derivatively on behalf of Nominal Defendant Satcon Technology Corporation ("Satcon" or the

"Company") and hereby submits this Verified Amended Shareholder Derivative Complaint (the

"Amended Complaint") against certain current and/or former members of its Board of Directors

(the "Board") seeking to remedy Defendants' breaches of fiduciary duties and unjust enrichment

from March 4, 2010 to July 5, 2011 (the "Relevant Period").  Plaintiff alleges upon personal

knowledge as to himself and his own acts, and as to all other matters upon information and belief

based upon his attorneys' investigation, which included, but was not limited to a review of United States Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available information regarding the Company.

## I.      NATURE OF THE ACTION

1.      Satcon provides clean energy technology and utility grade power solutions for the renewable and distributed energy markets.   The Company provides businesses and utility companies with power conversion solutions and system design services for converting renewable energy sources into electrical power. Its two primary product offerings are micro grid solutions and utility grade inverters for solar photovoltaic ("PV") and fuel cell applications.   In 2009, Satcon unveiled a new product called Satcon Solstice, which is a complete power harvesting and management solution for utility scale power plants.

2.      Throughout the Relevant Period, the Company made materially false and misleading statements concerning Satcon's operations, finances, financial condition, and present and future business prospects.   These false and misleading statements were made by or on behalf of members of the Company's Board of Directors, who, due to their positions within Satcon, had access to information about the Company that was both material and non-public. This information included five factors that adversely impacted the Company's business. First, the European governments' financial incentive programs, which promoted solar energy, had largely expired. Second, Satcon's reported and projected financial information was predicated upon expiring European government sponsored financial incentive programs. Third, if European governments did not renew the financial incentive programs, which was unknown and uncertain during the Relevant Period, the Company's European revenues would plummet. Fourth, that as a result of the aforementioned factors the Company's reported and projected financial information

was false and misleading. Fifth, as a result of the slowdown in orders from GCL Solar, the start-up of Satcon's Asian manufacturing facility would likely be delayed.

3.     Despite this, the Individual Defendants allowed themselves and their fellow directors to disregard such adverse facts, and instead presented false and overly optimistic forecasts of the Company's future that were then publicly disseminated to shareholders through the Company's SEC filings and press releases.  As a result of Defendants' materially misleading statements and failures to disclose material facts regarding the Company's current and projected business outlook, Satcon's common stock traded at artificially inflated prices during the Relevant Period, with the share price peaking at $5.49 on January 18, 2011.

4.     On February 22, 2011, Defendants initiated the first of a series of disclosures that would slowly reveal some of the issues and challenges negatively affecting the Company's current and future financial prospects.  In a press release issued that day and filed with the SEC, Satcon announced its financial results for the fourth quarter and year-end of 2010.  Despite record highs in terms of revenues, Defendant Rhoades briefly alluded to some of the Company's percolating problems in revealing that revenues would be down in the first half of 2011 due to "some seasonal effect coming from the European region and the North American commercial rooftop business."  In response to the news, the price of Satcon fell nearly 30%, closing at $3.54 per share on a day marked by heavy trading volume.

5.     On April 7, 2011, Satcon announced its preliminary financial results for the first quarter of 2011.  Defendant Rhoades stated that revenues were expected to fall below the forecasted range because customers were delaying delivery of the Company's inverter systems for later in the year and the Company's construction projects were delayed.  In reaction to this news, Satcon stock price fell $0.23 cents per share and closed at $3.29 per share.

6.      On April 27, 2011, Satcon issued a press release announcing its financial results for the first quarter of 2011.  The Company expanded upon the scope of its European problems and explained that European business fell short of expected levels due to changes and uncertainty in renewable energy policies.  Upon dissemination of this news, stock price fell $0.19 per share, closing at $3.00 per share.

7.      Satcon announced its preliminary financial results for the second quarter of 2011 on July 5, 2011. In the press release, Defendant Rhoades disclosed more than had previously been stated concerning the Company's continuing difficulties.  Rhoades confirmed that Satcon would be "narrow[ing]" its revenue guidance, with revenues as well as gross margins expected to fall below previous guidance. He acknowledged delays in construction projects and ongoing changes in government incentives in Europe with regard to solar energy.  Finally, the Company also revealed a workforce reduction of 15%.  In reaction to this news, Satcon's stock price dropped 23% on heavy trading volume, closing at $1.95 per share.

8.      While Defendants, due to their positions as directors of the Company, had access to non-public material information regarding the Company's sales figures, projections, inventory, and market conditions in specific regions, Defendants concealed these harsh truths from the investing public during the Relevant Period. Furthermore, they allowed the Company to issue materially false and misleading statements regarding the Company's business practices and financial condition, all while lacking a sufficient basis for the positive statements and optimistic outlooks they disseminated to Satcon's shareholders and the investing public.

9.      Defendants harmed the Company by allowing it to issue materially false and misleading statements, resulting in a loss of significant Company value and exposure to federal securities law violations.  Indeed, as a result of Defendants' wrongful acts and omissions, the

Company is now exposed to millions of dollars in defense costs and potential liability as a result of securities class action litigation filed against the Company.

10.     As a result, Plaintiff seeks to recover damages suffered, and to be suffered, by the Company as a result of the wrongful acts of its directors as described herein.

## II.   JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) in that Plaintiff and Defendant are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this district because nominal defendant Satcon maintains its principal executive offices in the District.

## III.  PARTIES

13.     Plaintiff, Thomas Burkett, is a current shareholder of Satcon and has held Satcon stock at all times during the Relevant Period. Plaintiff is a citizen of the State of Florida.

14.     Nominal defendant Satcon is a corporation organized and existing under the laws of Delaware.  Satcon maintains its principle executive offices located at 25 Drydock Avenue, 7th Floor, Boston, Massachusetts 02210.

15.     Defendant Charles S. Rhoades ("Rhoades") is, and was at all times during the Relevant Period, Chief Executive Officer ("CEO"), President, and a Class III director of Satcon. He has been a director of the Company since 2008.  Rhoades is a resident of Massachusetts.

16.     Defendant John M. Carroll ("Carroll") is a Class I director of Satcon and Chairman of the Board's Audit Committee.  He has been a director of the Company since May

2005, and he became Chairman of Satcon's Board in October 2006.  Carroll is a resident of Massachusetts.

17.     Defendant Philip J. Deutch ("Deutch") is a Class II director and has been a director of the Company since November 2007.  Deutch is Managing Partner of NGP Energy Technology Partners, L.P., a private equity fund that invests in companies that develop energy technologies and provide technology driven products and services to the energy industry. Deutch, through NGP Technology Partners, owns approximately 8% of the Company's outstanding shares. Deutch is a resident of Massachusetts.

18.     Defendant Daniel R. Dwight ("Dwight") is a Class III director and has been a director of the Company since 2006. He is also a member of the Board's Audit Committee. Dwight is a resident of Massachusetts.

19.     Defendant James L. Kirtley, Jr. ("Kirtley") has been a Class I director since 1992. Kirtley is a resident of Massachusetts.

20.     Defendant David J. Prend ("Prend") is a Class III director of Satcon and has been a director of the Company since November 2007.  Prend is a Managing General Partner of RockPort Capital Partners, which owns approximately 18.1% of the Company's outstanding shares. Prend is a resident of Massachusetts.

21.     Defendant Robert G. Schoenberger ("Schoenberger") is a Class II director and a member of Satcon's Audit Committee.  He has been a director of the Company since December 2007.  Schoenberger is a resident of Massachusetts.

22.     The Defendants identified in paragraphs 15-21 are collectively referred to as the "Individual Defendants" or the "Board."  The Individual Defendants and Satcon are collectively referred to herein as the "Defendants."

23.     Defendants Carroll, Dwight, and Schoenberger are collectively referred to as the "Audit Committee" or the "Audit Committee Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS AND THE AUDIT COMMITTEE

24.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits.  Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

25.     To discharge their duties, the officers and directors of Satcon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Satcon. By virtue of such duties, the officers and directors of Satcon were required to, among other things:

(a) manage, conduct, supervise and direct the business and internal affairs of Satcon in accordance with the laws and regulations of Massachusetts, Delaware, the United States, and pursuant to the charter and bylaws of Satcon;

(b) neither violate, nor knowingly permit any officer, director or employee of Satcon to violate applicable laws, rules and regulations;

(c) remain informed as to the status of Satcon's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Satcon and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Satcon's operations would comply with all laws, Satcon's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Satcon shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f) exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Satcon by the officers and employees of Satcon and any other reports or other information required by law from Satcon and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Satcon and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

26.     During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of Satcon, were privy to confidential and proprietary information concerning Satcon, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public

information concerning Satcon, as discussed in detail below. Because of their positions with Satcon, the Individual Defendants had access to nonpublic information about its business, finances, products, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that adverse facts specified herein had not been disclosed to, and were being concealed from, the Company's shareholders, the SEC, and the public.

27.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to shareholders and the public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to, and did, cause or allow the fraudulent acts alleged herein.

28.     As senior executive officers and/or directors of a publicly-traded company whose common stock was, and continues to be, registered with the SEC pursuant to the Exchange Act, the Individual Defendants were, and continue to be, governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to Satcon's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the

market price of Satcon's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, Individual Defendants breached their fiduciary duties by causing and/or recklessly permitting violations of federal securities laws.  Moreover, each of the directors have breached their fiduciary duties through their knowledge and continuance of management's Medicare manipulation and failure to properly supervise management in permitting the corporate culture at the Company that fostered wrongdoing.

29.     Satcon's Board consists of seven (7) directors: Rhoades, Carroll, Deutch, Dwight, Kirtley, Prend, and Schoenberger.  As established *infra*, Satcon's Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to implement internal controls sufficient to reasonably assure that the Company's statements were accurately prepared and presented, failure to oversee the Company's compliance with legally mandated disclosure standards and Defendants' impermissible placement of personal interests above the interests of the Company, and/or (2) are not independent from members of Satcon's Board of Directors who face a substantial likelihood of liability.

30.     Moreover, the Audit Committee's charter requires the Audit Committee Defendants to oversee (i) the accounting and financial reporting processes of the Company and the audits of the Company's financial statements and (ii) the qualifications, independence, and

performance of the Company's outside auditors.

31.     The Audit Committee charter also states that the "Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct." The Audit Committee did not satisfy its duties as mandated by the Audit Committee Charter because it failed to implement and maintain adequate internal controls and disclosure processes.

## V.     FURTHER SUBSTANTIVE ALLEGATIONS

### (a)     Background

32.     Satcon is a power conversion equipment manufacturer based in Boston, Massachusetts.  It provides utility-grade power conversion solutions for the renewable energy market, delivering its services and products to customers around the world, including North America, Asia, and Europe.  The Company's products enable large-scale producers of renewable energy to convert the clean energy they produce into grid-connected, efficient, and reliable power.  Its two core product offerings are micro grid solutions and utility grade inverters for solar photovoltaic ("PV") and fuel cell applications.

33.     In recent years, technological advancements in solar PV inverters have been a contributing factor to the growth of large-scale distributed power systems. As a result of their increased capacity, improved output quality, and advanced control features, PV inverters are expected to help improve the performance of solar PV systems.

34.     Demand for PV inverters rose with the increase of solar PV installations. By the third quarter of 2009 demand for PV inverters exceeded supply. Demand for PV inverters was largely driven by new solar PV installations in Europe, particularly in Germany, Italy, and the

Czech Republic. Suppliers struggled to keep pace with the increased demand and by mid 2010 worldwide product shortages were increasingly common.

35.     Three primary factors drove the demand for PV inverters. First, governments adopted clean energy incentive and subsidy programs. Second, technological advancements in PV inverters made the products the centerpiece of typical solar PV arrays. Third, social and political unrest in oil rich countries caused many people to look to alternative energy sources.

36.     Defendants wanted to capitalize on the European government incentive programs before they expired. Therefore, in the second half of 2010 Satcon attempted to ship as much of its product to Europe before the incentive programs expired and demand for Satcon products plummeted.

37.     Defendants knew that the spike in demand during the second half of 2010 was induced by customers' desire to capitalize on the European governments' financial incentive programs before the programs expired.  Importantly, the Company knew or should have known that the demand for its product would decline significantly if the European financial incentive and subsidy programs were not renewed.

38.     This is evidenced by the sharp decrease in revenues from the second half of 2010 compared to the first quarter of 2011. In 2010, the Company's average revenue per quarter from its European business was $23 million. The revenue for the first quarter of 2011 – the first quarter following the expiration of many European governments' incentive and subsidy programs – was $1.5 million. This represents a 94% decrease in revenues from the Company's European business.

**(b)** **Materially False and Misleading Statements Issued During the Relevant Period**

39.     On March 4, 2010, the Company issued, and filed with the SEC, a press release announcing its financial results for the fourth quarter and full year-end of 2009 for the period ending December 31, 2009.  Satcon reported $21.5 million in revenues and $7.4 million in net losses attributable to common shareholders.  Satcon's CEO, Defendant Rhoades, reported that he was "very pleased" with the Company's fourth quarter performance, which he said "marked the strongest period for sales of our renewable energy solutions in Satcon's history."  He further stated that Satcon "remained on track" with its strategic plan to expand into Europe and Asia. Defendant Rhoades forecasted 2010 first quarter revenues of $14 to $16 million and a significant increase in sales of PV inverters. He stated:

> Our solid backlog and pipeline in the early part of this year are ***indicative of a strong 2010 for Satcon***. Our dedication to product innovation and expanding our global capacity, coupled with efforts to lower our overall manufacturing costs**, *position us well for growth and profitability during the year***.

> For the first quarter of 2010, we are introducing ***top-line guidance of $14 to $16 million***. Despite expecting lower sequential results over Q4 due to typical seasonality in the industry, we anticipate Q1 sales of our PV inverter solutions to double over the same period last year. Gross margin will also continue to improve over 2009 levels as we increase sales volumes and transition our manufacturing to our lower-cost facility in China. [Emphasis added.]

40.     The statements in ¶39 were misleading because they failed to disclose four material facts.  First, the European governments' financial incentive programs, which promoted solar energy, had largely expired. Second, Satcon's reported and projected financial information was predicated upon expiring European government sponsored financial incentive programs. Third, if European governments did not renew the financial incentive programs, which was unknown and uncertain during the Relevant Period, the Company's European revenues would plummet. Fourth, that as a result of the aforementioned factors the Company's reported and projected financial information was false and misleading.

41.     On May 6, 2010, the Company issued, and filed with the SEC, a press release announcing its financial results for the first quarter of 2010, for the period ending March 31, 2010.  Satcon reported $14.7 million in revenues and $7.2 million in net loss attributable to common shareholders. Defendant Rhoades reported that he was "very pleased" with the Company's first quarter performance, which "continued to build on the strong growth momentum of 2009 and further strengthened our position as the world leader in utility grade power conversion system solutions."  He further stated that Satcon was "well positioned to deliver significant top line growth in 2010," and attributed the growth of the Company's backlog to, among other things, a "significant increase in orders through our expanded presence in both China and Europe."  In terms of guidance for the second quarter of 2010, Defendant Rhoades forecasted that revenues would also "increase significantly" to between $25 and $28 million, along with an increase in gross margins to over 20%, with further margin expansion to over 30% in the second half of 2010.  These statements were misleading for the reasons set forth in ¶40.

42.     On August 5, 2010, the Company issued, and filed with the SEC, a press release announcing its financial results for the second quarter of 2010, for the period ending June 30, 2010.  Satcon reported $27.6 million in revenues and $8.5 million in net loss attributable to common shareholders. In relevant part, Defendant Rhoades reported:

> Second quarter sales of $27.6 million represented the largest quarter in Satcon's history, reaching revenues over two and a half times greater than what we reported in the same period a year ago. We also grew gross margin to 21%, a significant improvement over last quarter's 14%, fueled by the transfer of our primary manufacturing to our lower cost facility in Shenzhen, China, which we completed during the second quarter.

43.     He also commented on the strength of Satcon's backlog and bookings activity, and noted that the Company would significantly increase its capacity in the second half of the

year.  For the third quarter of 2010, Defendant Rhoades forecasted revenues between $43 and

$47 million and gross margin greater than 30%. He stated:

> [W]e remain on target to have our operations plan fully implemented by the end of Q3. With these improvements, we expect that our margins in the third quarter will be in the mid to high 20's, and margins for the fourth quarter will be in the low to mid 30% range.
>
> We see momentum continuing into our fourth quarter of 2010, and expect that our fourth quarter revenues will increase over those that we generate in our third quarter.

These statements were misleading for the reasons set forth in ¶40.

44.     The Company scheduled a conference call on August 5, 2010 to further discuss

the Company's second quarter financial results with analysts and investors. On the call

Defendant Rhoades and the Company's Chief Financial Officer, Executive Vice President, and

Treasurer, Donald Peck ("Peck") commented on the Company's short-term business prospects.

Importantly, Defendant Rhoades stated that the Company expected its European business to

remain strong for the duration of 2010. Defendant Rhoades and Peck stated, in relevant part:

> **<u>Defendant Rhoades</u>**: As of August 3, 2010, the Company's backlog, which consists of firm, fixed purchase orders with customers, totaled over $110 million. This is a significant increase over the $80 million in backlog announced last quarter, and it shows the growing market for utility projects, as well as the demand for Satcon's industry leading technology for this sector.
>
> The current backlog consists of 390 megawatts of our large-scale inverter solutions at 250 kilowatts and above and reflect our growing global footprint and success, securing large portions of market share in Europe and Asia, while maintaining our dominant position in the evolving large-scale North American inverter market.
>
> **<u>Peck:</u>** Bookings for the first half of the year were $123 million, an increase of 1,100% over the bookings we recorded for the first half of 2009 of $10.1 million, as we continue to maintain our market leadership position in North America and China and expand our sales presence in Europe. Our backlog, which consists off [sic] firm, fixed purchased orders from our renewable energy customers, was $82 million as of quarter end and a record $111 million as of August 3, 2010. About 90% of this backlog is currently scheduled to ship this calendar year.

\*\*\*

*In Europe, our revenues for the first half 2010 are up over 400% from the same period in 2009. In the second quarter of this year alone, our revenues were $12.5 million and our backlog for Europe now stands at over 86 megawatts.* We see no decline in our growth rates in this region through the balance of 2010 as we continue to expand our market share toward a leadership position similar to what we have established in North America over the last two years.

Since mid 2009, Satcon has become a leading choice for large-scale inverter developing, capturing major projects in Germany, Italy, Belgium, Czech Republic, Slovenia, Greece and France. In the Czech Republic, for instance, in a very short time, Satcon has established itself as the number one supplier of utility scale solar PV inverter solutions, with over 60 megawatts shipped since 2009.

We are also increasing our traction in Germany, where we received orders from four large German PV project developers. And again, *we see no deceleration in our bookings for the Czech, German or any of the other major markets in Europe at this time.*

The growth in the European market is anchored by our PowerGate 500 kilowatt CE Solution, which continues to be the most utilized 500-kilowatt solution for large scale solar PV systems on the market.

A recent example of Satcon's growing European presence is in France, with Enfinity, one of the world's leading solar energy development companies. Enfinity recently completed an 18-megawatt plant, using Satcon's utility ready PowerGate Plus 500 kilowatt CE inverters.

45.     On the August 5, 2010 conference call, Defendant Rhoades indicated that

European demand for Satcon products did not show signs of slowing. Rhoades stated:

But as we pointed out in the call, *we haven't seen a slowdown in Europe. In fact, the other direction.* And we -- you know, our business in Asia-Pac continues to grow, but, you know, we've seen a lot of strength in North America, a lot of strength in Canada and continued strength in Europe.

\*\*\*

Well, given our growth in Europe and Asia, I think we'd have to be taking market share in Europe and Asia, right? We're -- you know, we did not have a strong presence in either of those regions last year. We were primarily North America. *We had some good business in Europe but not a lot. Whereas, this year we've seen quite a bit of strength in many of the countries in Europe*, as we mentioned. *Particularly strong in the Czech Republic, but increasing presence in France and Germany and Italy and Greece and Slovenia.*

16

***

Right now bookings are very strong, and we would expect that to continue as we move into the beginning of the first -- the fourth quarter. But there's definitely seasonal slowdown that we're going to see in order trends as we get to the back half of Q4. And, you know, we have tended over time to have the first quarter be our lowest quarter and then see strengthening through the whole year for our revenue. That's been our trend for several years, and I would expect that to be the same next year.

***

We've seen through the year that the market or project finance has improved dramatically over what it was a year [sic]. That's true in both the US and in Europe. Questions around bankability and Europe have largely gone away. We've not seen a lot of that. This year the -- it's been a little bit looser in the -- in that market.

46.      The statements in ¶¶44 and 45 were misleading because they failed to disclose four material facts.   First, the European governments' financial incentive programs, which promoted solar energy, had largely expired. Second, Satcon's reported and projected financial information was predicated upon expiring European government sponsored financial incentive programs. Third, if European governments did not renew the financial incentive programs, which was unknown and uncertain during the Relevant Period, the Company's European revenues would plummet. Fourth, that as a result of the aforementioned factors the Company's reported and projected financial information was false and misleading.

47.      Satcon issued a press release on September 29, 2010, announcing that it entered into a strategic manufacturing agreement with GCL Solar Systems Limited ("GCL Solar"). The agreement aimed to enhance the production of Satcon's solar PV inverters in the Asia Pacific market and called on GCL Solar to commission a manufacturing facility in Nanjing, China. The press release provided, in relevant part:

Satcon Technology Corporation(R) (NASDAQ CM: SATC), a leading provider of utility scale power solutions for the renewable energy market, today announced a strategic manufacturing agreement with GCL Solar Systems Limited, one of China's largest utility solar power plant developers, to enhance production of their

17

industry leading 500 kilowatt (kW) PowerGate(R) Plus line of solar PV inverters for the Asia Pacific market.

Under the terms of the agreement, GCL Solar is commissioning a manufacturing facility in Nanjing, China, which is expected to be capable of producing over 500 megawatts (MW) of production of the 500kW PowerGate Plus inverters in 2011. Satcon(R) is expected to provide GCL Solar with the core manufacturing processes and technologies for the PowerGate Plus solutions for final assembly at the GCL Solar plant. GCL Solar has agreed to purchase from Satcon the capacity to produce a minimum of 300MW per year out of the GCL Nanjing operation. The PowerGate Plus 500kW inverters manufactured at the Nanjing facility under this Agreement are expected to be sold by GCL Solar into the Chinese solar PV market, and used on GCL Solar funded utility solar developments around the world.

"Over the past two years, the Chinese government has made significant strides in the development and support of large scale renewable energy resources. In that time period, GCL Solar has become the leading developer of utility scale solar PV plants in all of Asia," said Dr. Gu, Chief Executive Officer of GCL Solar. "Our partnership with Satcon has helped our dominant position in this market, and today we announce an even closer agreement with the world's leading provider of utility scale solar power conversion technologies. This enhanced level of cooperation will help enable us to develop and deliver the world's most advanced and successful large scale solar plants in both China as well as with our other projects worldwide with the highest levels of reliability and total system quality."

Production out of the Nanjing manufacturing facility is expected to begin in March of 2011, and when combined with the expanded Burlington, Ontario operations is expected to increase worldwide manufacturing capacity to over 2 annual gigawatts.

48.    On or about October 9, 2010, the Company filed a Registration Statement ("Registration Statement"), which included a Prospectus and Supplemental Prospectus (collectively "Prospectus"), with the SEC in connection with a Second Offering ("Secondary Offering"). The Secondary Offering, which included an underwriter's overallotment option of 1.35 million shares, would offer 10.35 million shares of common stock to the public. The Company anticipated that the shares would be priced at $3.90 per share. The Registration Statement, however, was misleading because it failed to disclose the material adverse facts set forth in ¶40.

49. Satcon was desperate for cash at the time of the Secondary Offering because the Company's accounts payable and accrued expenses were $50 million, which was roughly double the amount for the same liabilities nine months prior. Additionally, during the same nine month period, Satcon increased its line of credit five times but still needed cash. As a result of the Company's misleading statements and its failure to disclose the adverse factors regarding its European business, Satcon made the Secondary Offering at a time when its stock was trading at artificially inflated prices.

50. On October 27, 2010, the Company issued a press release announcing the completion of its Secondary Offering in which it sold 10.35 million shares of common stock. As anticipated, the shares were priced at $3.90 per share and yielded net proceeds of approximately $37.5 million. The Prospectus stated that the net proceeds from the sale would be used for working capital, general corporate purposes, and possible acquisitions of other businesses, products, or technologies.

51. The Prospectus reinforced the Company's 2010 third quarter financial results and fourth quarter projections it provided in an October 18, 2010 press release. The Prospectus stated, in relevant part:

*Preliminary Results for Third Fiscal Quarter and Fourth Quarter Guidance.*

On October 18, 2010, we announced preliminary unaudited financial results for revenue, gross margin percentage, operating profit and net income for our third quarter ended September 30, 2010, bookings and backlog, and estimated revenues and gross margin percentage for our fourth quarter ended December 31, 2010.

With respect to the period ended September 30, 2010, we announced that we expect to report:

☐ revenues of between $56 million and $58 million for the three months ended September 30, 2010, an increase of over 450% from our revenues during the three months ended September 30, 2009, which would exceed our previously announced guidance of between $43 million and $47 million;

☐ revenues of between $98 million and $100 million for the nine months ended September 30, 2010, an increase of approximately 220% from our revenues during the nine months ended September 30, 2009;

☐ gross margin percentage for the three months ended September 30, 2010 of between 26% and 28%, which percentage would be consistent with our previously announced guidance; and

☐ positive operating income for the three months ended September 30, 2010.

* * *

In addition, we reported that our bookings recorded during the third quarter were approximately $78 million, and that our bookings recorded during the nine months ended September 30, 2010 totaled over $200 million, an increase of 465% over the bookings recorded during the same nine-month period in 2009. Our year-to-date bookings represent over 800 MW of orders for our products, with 49% of those bookings coming from North America, 28% from Europe and 23% from Asia.

At October 15, 2010, our backlog, which consists of purchase orders from our customers expected to be shipped during the balance of 2010 and through September 30, 2011, was approximately $124 million. At such date, North American customers represented 58%, Asian customers represented 24% and European customers represented 18% of our backlog.

With respect to the fourth quarter of 2010, we announced that we expect our revenues to be in the range of $70 million to $75 million and our gross margin percentage to be between 28% and 32%.

52.     Importantly, the Prospectus acknowledged that government incentive programs were fueling growth in many European countries. The Prospectus stated:

> *Government incentives are accelerating growth in the power conversion market.* **Many countries, including Germany, France, Italy, Greece**, the United States, Canada, China and India, have set policies, such as renewable portfolio standards, to achieve a certain percentage of their overall energy incentives and subsidies to fuel the construction of renewable energy power plants. ***As our power conversion systems are integral components of many renewable energy power plants, primarily solar PV plants, we expect demand for them to continue to experience growth as a direct result of these government programs.***

53.     The Prospectus also noted that the Company was poised to take full advantage of the anticipated growth in European markets. The Prospectus noted, in relevant part:

We believe that we are positioned to take advantage of significant growth opportunities in key solar PV markets in North America and Asia and in the established and thriving solar PV market in Europe.

*\*\*\**

*Well-Positioned to Capitalize on Anticipated Growth in Key Markets*. We have a leading presence in the growing renewable energy markets of North America and Asia, and over the past year have gained significant market share in the established market of Europe. Solar PV inverter installations in the United States are estimated to grow by approximately 40% compounded annually during the next three years according to IMS Research, and the largest growth within the industry is expected to be in the large-scale commercial and utility-scale segments as the United States is expected to become a key market in the global solar PV industry. In Canada, primarily as a result of the recently announced feed-in tariff, the Province of Ontario has become one of the fastest growing markets for commercial and utility PV development. Ontario has mandated that PV developers and utilities use a percentage of locally manufactured components in order to qualify for the program. Because we have manufactured inverters in Ontario for more than ten years, we have a unique opportunity as a supplier to this high growth market. The demand for large-scale commercial and utility-scale solar power in China continues to expand at a rapid pace, with a projected compound annual growth rate of approximately 90% between 2009 and 2014 according to IMS Research. Our strategic relationship with GCL Solar, one of China's largest utility-scale solar power plant developers and suppliers, has made us a preferred supplier in China. We are also well-positioned to gain market share in the established European market. Europe represents the largest PV inverter market globally with more than 70% of PV inverter sales in 2009 and projected PV inverter sales growth of approximately 10% compounded annually per year through 2014, according to IMS Research. Our investments in North America, Europe and around the world are enabling us to increase our presence globally and have resulted in substantially increased customer bookings in 2010.

54.     The statements in ¶¶51 through 53 were misleading because they failed to disclose four material facts.  First, the European governments' financial incentive programs, which promoted solar energy, had largely expired.  Second, Satcon's reported and projected financial information was predicated upon expiring European government sponsored financial incentive programs.  Third, if European governments did not renew the financial incentive programs, which was unknown and uncertain during the Relevant Period, the Company's

European revenues would plummet. Fourth, that as a result of the aforementioned factors the Company's reported and projected financial information was false and misleading.

55.     The Company filed its Registration Statement on Form S-3. Accordingly, Instruction 11(a) of Form S-3 requires all issuers to disclose:

> any and all material changes in the registrant's affairs which have occurred since the end of the latest fiscal year for which certified financial statements were included in the latest annual report to shareholders and which have not been described in a report on Form 10-Q or Form 8-K filed under the Securities Exchange Act of 1934.

56.     To comply with Instruction 11(a) of Form S-3, the Company was required to update its previous filings, which were incorporated by reference in the Registration Statement. One such update required Satcon to make additional disclosures pursuant to Item 303(a) of Regulation S-K. 17 C.F.R. § 229.303. Consequently, the Company needed to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

57.     The incentive programs offered by European governments, and whether they would be renewed, were reasonably likely to have a material impact on Satcon's continuing operations. As such, the Company was required, but failed to make, any disclosures regarding the European incentive programs.

58.     Furthermore, Item 3 of Form S-3 required the Company to include in the Registration Statement and Prospectus "a discussion of the most significant factors that make the offering risky or speculative." 17 C.F.R. § 229.503. Although Satcon incorporated by reference the risk factors from its 2009 Form 10-K, the risk factors failed to include meaningful disclosures

about European governments' financial incentive programs and its potential effect on the Company.

59.     Importantly, the 2009 Form 10-K that was incorporated by reference in the Registration Statement and Prospectus included language about how the reduction or cessation of European incentive programs "could" impact Satcon. The 2009 Form 10-K noted, in relevant part:

> ***Reductions in government subsidies could impact revenue growth in the renewable energy markets***.
>
> Various government subsidies, including feed-in tariffs, have been a significant driver in the growth of the renewable energy industry, with countries throughout the world providing incentives to spur adoption of renewable energy. While many countries are beginning to adopt feed-in tariffs and varying subsidies, others are reevaluating the level of incentive they wish to provide or have proposed reductions to their feed-in tariffs. Any reduction in such subsidies could result in a decline in demand and price levels for renewable energy products, which could have a material adverse effect on our business, financial condition or results of operations.

60.     At the time of the Secondary Offering, many of the European government incentive programs had expired. The cessation of these programs had a material impact on the Company's revenues. In the second half of 2010, European customers accounted for $23 million of revenues. By the first quarter of 2011, after many European governments terminated or reduced their incentive programs, European customers accounted for a paltry $1.5 million of revenues.

61.     On October 28, 2010, the Company issued, and filed with the SEC, a press release announcing its financial results for the third quarter of 2010, for the period ending September 30, 2010.  Satcon reported $58.4 million in revenues and $1.6 million in net loss attributable to common shareholders.  Defendant Rhoades commented on the results as follows:

Satcon posted another record quarter with sales reaching $58.4 million, representing over 480% growth from what we reported in the same period a year ago, and exceeding our preliminary revenue projection of $56 million to $58 million. We also grew gross margin to 27%, which was in line with our guidance and ahead of last quarter's gross margin of 21%.

*Given the continued strength of the utility scale market, coupled with our robust revenue growth and current backlog and pipeline, we continue to believe that we will acquire 20 percent of the global market for PV inverters at 250 kilowatt and above in 2011.* [Emphasis added.]

In terms of guidance for the fourth quarter of 2010, Rhoades forecasted as follows:

*By concentrating our efforts on next-generation technologies, coupled with the expansion of our international sales and service, and manufacturing footprint, we are positioning Satcon for long-term growth and with a clear differentiation from our current and future competitors.* As we look to the remainder of 2010, we expect our fourth quarter revenues will increase significantly to between $70 million and $75 million and our gross margin percentage to be between 28% and 32%. *On the strength of our bookings pipeline and diversification of our geographic presence, we do not expect revenues in the first quarter of 2011 to be affected by the seasonality we've experienced in recent years.* [Emphasis added.]

These statements were misleading for the reasons set forth in ¶40.

62.     The Company hosted a conference call following its October 28, 2010 press release to further discuss its 2010 third quarter results and fourth quarter projections with analysts and investors. Defendant Rhoades commented on the Company's 2010 third quarter results and provided 2010 fourth quarter guidance:

I am extremely pleased to report to you on yet another record revenue quarter for Satcon. In line with our preliminary results reported last week, we are very pleased to have posted revenues ahead of our projection of $56 million to $58 million with Q3 2010 ending at $58.4 million. This represents an increase of more than 480% over our reported renewable energy solution revenues for the same quarter a year ago. Gross margins came in within our goal at 27% and we expect this upward trend in gross margin to continue in the fourth quarter and into 2011.

As we introduced last week, we expect revenues for the fourth quarter of 2010 to be between $70 million and $75 million and expect to achieve a gross [margin] percentage for the fourth quarter of between 28% and 32%.

***

As we look to the remainder of 2010, ***we expect our fourth-quarter revenues will increase significantly to between $70 million and $75 million***, and our gross margin percentage to between 28% and 32%. On the strength of our booking pipeline and diversification of our geographic presence, ***we do not expect revenue in the first quarter of 2011 to be affected by the seasonality we've experienced in past years.***

***

***In Europe, our revenues for the first nine months of 2010 are up over 1100% from the same period in 2009*** and represented 38% of sales during the period. Year-to-date, we have booked over 220 MW, expanding over seven countries, with the largest orders coming from Czech Republic, France, Germany, Greece and Italy.

In France, for instance, we recently provided 36 of our PowerGate 500 kW inverters to Enfinity, one of the region's leading solar PV development companies. This 18 MW installation now serves as one of the largest solar farms in the country. We also continued to increase our traction in Germany, where we have received orders from a large German PV project developer to power a 19.5 MW project, which will utilize 39 of our PowerGate 500 kW inverters.

***Despite the perceived impending slowdown in some of the European markets, our pipeline remains robust. We see a high volume of residential in light to medium commercial installations, transitioning to large scale multi-megawatt solar power plants, which leverages our most innovative solutions in markets like Germany, Italy and France.***

***At this time, we see no decline in our growth rates in any of these major markets in Europe*** as we continue to grow our leadership position there.

63.     On the same conference call, analysts peppered Peck with questions regarding the

possible slowdown in European markets. The exchange went as follows:

**<u>Aaron Martin, Analyst, AIGH Investment Partners:</u>**

Congratulations on the progress here. ***I just want to see if you guys could give a little more clarity when you talk about Europe and seeing the growth rate not declining***. In just looking at the backlog numbers in the last few quarters and as a percentage of your [total] backlog, Europe is down. Even in dollar numbers it's down slightly.

So, what are we talking about when you say, the growth rate not declining, what's the basis --? What's not declining off of what type of rate are we talking about?

**Peck:** Well -- this is Don Peck. ***While the percentage is going down they are certainly on a much higher backlog number.***

**Martin:** Relative to, I mean just, to work on it relative to when? Are we talking about last year? Are we talking relative to the last few quarters?

**Peck:** Relative to the last few quarters. North America has grown even more quickly.

**Martin:** Yes. That, I understand. But even saying, just using the quarter-end back-log numbers of 15 of 93 and 13 of 82, was the number it was - - you are still slightly even, slightly lower even dollar number, such as -- what am I missing?

**Peck:** We may have to just go and dig here, ***but on a dollar basis and a MR basis, our European shipments and our European backlog have grown quarter over quarter and we may just have to get offline with you and go through the numbers with you***. But we - more carefully - I think we will have to dig here a little bit to get the exact numbers that you are looking for.

But we have seen both dollars and MW increase. Percentages may be different because (multiple speakers).

Exactly, so as North America grows faster it becomes the biggest part of the backlog. But so the shifting in the mix is the effect between quarters, but the dollar amounts certainly have gone up dramatically quarter over quarter in each geography.

64.     Furthermore, Peck stated that he was not expecting the Company to suffer from its usual slowdown during the first quarter of fiscal 2011. Rather, he stated:

Right now, what we see is, no slowdown as we move through year end. So, we are certainly not looking for any seasonal dip as we go from Q4 to Q1. ***We are actually looking for revenue to be up as well.***

65.     The statements in ¶¶62 through 64 were misleading because they failed to disclose four material facts.  First, the European governments' financial incentive programs, which promoted solar energy, had largely expired. Second, Satcon's reported and projected financial information was predicated upon expiring European government sponsored financial incentive programs. Third, if European governments did not renew the financial incentive

26

programs, which was unknown and uncertain during the Relevant Period, the Company's European revenues would plummet. Fourth, that as a result of the aforementioned factors the Company's reported and projected financial information was false and misleading.

### (c) Satcon Begins to Reveal Material Adverse Conditions and Situations Affecting the Company's Financial Condition and Future Business Prospects

66.     On February 22, 2011, Satcon made the first of its disclosures regarding the challenges facing its business.  The Company issued, and filed with the SEC, a press release announcing its financial results for the fourth quarter of 2010 and fiscal 2010, for the period ending December 31, 2010.  Satcon reported $72.6 million in revenues and an operating income of $3.5 million.  Defendant Rhoades noted that "2010 marked a record year for Satcon, with quarter-end and full-year sales meeting our top-line guidance, and each growing over three times the amount of sales we reported in the same periods a year ago."  He added that gross margin improved in each quarter and that the Company posted an operating profit for the last two consecutive quarters of the year.  In the press release, Defendant Rhoades gave his fiscal 2011 guidance:

> We continue to see significant ongoing market opportunity presented to us by the breadth and reputation of our utility scale solutions, with additional revenue potential coming from design, configuration, and other after-market programs that we have introduced and that are in our pipeline. ***Looking at the first half of 2011, we expect to see some seasonal effect coming from the European region and the North American commercial rooftop business. However, we expect this slowdown to be offset by strong sales into the North American utility-scale market, and orders from our Chinese partnerships.***

> With a mix shift of sales from Europe to Asia, where ASP's tend to trend lower, coupled with a higher proportion of our sales coming from our newest technology, including the Solstice 500kW solution, which is not yet fully transferred to our high volume Asian manufacturing facility and Asian sources, we expect Q1 revenues to be in the range of $65 to $70 million with our gross margin between 25% to 27%. ***As we look out to Q2, we expect a significant increase in volume from Europe and North America, and increased gross***

*margin on improvements in our supply chain and greater utilization of our Asian manufacturing facilities. We expect to continue our run of operating profitability throughout the year.* [Emphasis added.]

67. Satcon hosted a conference call to further discuss the Company's 2010 fiscal fourth quarter and year end results with analysts and investors. On the conference call, Defendant Rhoades contradicted his previous guidance that Satcon's 2011 first quarter would not be adversely impacted by the traditional seasonal slowdown in Europe. Rhoades stated, in relevant part:

> I couldn't be more pleased to be sharing our 2010 results with everyone today. Not only did we post record earnings and growth, but we achieved both our margin and profit targets for the year. In the fourth quarter, revenues were $72.6 million, bringing our annual revenue to $173.3 million. That marks a quarter-over-quarter growth of 237%, and a year-over-year growth of 230% respectively. Our Q4 revenue was within the range we announced at our last earnings call of $70 million to $75 million, and our gross margins were 28.2%, which was also within the range of 28% to 32% we guided for the quarter.

> ***

> . . . Looking forward to 2011, *we do anticipate the typical seasonality in the European region* and the North American commercial rooftop business to affect our first-half revenues, as it has in past years. *However, we expect that this slowdown will mostly be offset, by a strong demand in the North American utility-scale market and China.* We also expect a very strong second half of the year, as we continue to take market share in Asia and Europe and other emerging markets.

68. On the conference call, Defendant Rhoades also commented on the Company's European business and its future business prospects on the continent. Rhoades stated, in relevant part:

> Another key strategic focus for Satcon has been to grow our business in Europe. Through leveraging our innovative solutions and adding a superior sales and service organization, Europe now represents 36% of our business. That's compared to less than 13% in 2009. For 2010, we booked nearly 300 megawatts of our large commercial and utility-scale systems. *We have made rapid progress gaining market share, particularly in Germany, Italy and France, and we are seeing opportunity coming from other emerging markets in Greece, Belgium and Eastern Europe.*

Satcon's PowerGate inverters have been used on some of the largest PV solar plants built in Europe in 2010, including the 18-megawatt Les Mees solar project in the south of France, and the 19.5 megawatt Tauberlandpark installation in Wertheim- Dorlesberg, Germany. Both of these projects mark a significant step in Satcon's continued growth in the European utility-scale solar market.

***

. . . And then, in Europe, ***Europe is becoming an increasing proportion of our overall market, we did about 30% for the last year in Europe.*** It's an important market for us, and we think we are continuing to gain share in that market, off of a low base, but continue to gain share.

***Much of the worry in the European market is more tied to the sub-100 kilowatt market, the residential and light commercial, that is not where we play at all. We don't have any products in that market in the European theater. So we think 2011 is going to be a strong year for us.***

69.     Additionally, during the question and answer portion of the conference call, Rhoades claimed that Satcon's decline in European business was caused by the traditional seasonal slowdown. John Hardy, an analyst for Gleacher & Company, asked Defendant Rhoades why he changed his views concerning the season slowdown:

**Hardy:** Thanks a lot for taking my questions. Steve, I was wondering ***what was the main things, main components that are changing your view on seasonality for Q1? More importantly, how have bookings been trending through the first couple of months for the year against that slower seasonal shipment period?***

**Rhoades**: I think that we have very strong protections for the quarter. We are protecting 65 to 70 against a number 72.6 in Q4. ***We are not seeing the kind of seasonality we've seen -- we saw in the past*** what we were completely dependent on the North American commercial market. ***But, it is a fact that we had good success in Europe, and the European utility market is very slow in the first quarter, and that has been an increasing portion of the business. We made up for most of that with utility-scale and large-scale commercial business in North America and Asia.***

70.     On the conference call, Rhoades told analysts and investors that Satcon maintained a "very strong" relationship with GCL Solar and did not indicate that the manufacturing arrangement between the two companies was not proceeding as planned. The

following is an exchange between Jeff Osborne, and analyst with Stifel Nicolaus, and Defendant

Rhoades:

> **Osborne:** Great, good evening and congratulations a strong result. I had a question, Don on the China business. I guess, maybe first for Steve. You mentioned the market looks to be a little bit softer than you or some of the analysts were expecting. I was trying to get a sense does, that impact the GCL relationship at all?

> **Rhoades:** Our relationship with GCL is very strong. We are continuing to ship them products here in this quarter and ***we're continuing to work on the manufacturing facility with them in Nanjing***. We are actually increasing our contacts by working with the EPC arm of the parent company. So, ***I think that we are very pleased with our partnership with GCL***, and look for that to continue to bring a lot of benefits to us and to them as we look out over 2011.

71.     Following these announcements, the price of Satcon's stock fell $1.29 per share,

or 27%, to close at $3.54 per share on heavy trading volume.  The Company, however, continued

to conceal the full scope of Satcon's problems.

72.     The statements in ¶¶66 through 70 were misleading because they failed to

disclose five material facts.  First, the European governments' financial incentive programs,

which promoted solar energy, had largely expired.  Second, Satcon's reported and projected

financial information was largely predicated upon expiring European government sponsored

financial incentive programs.  Third, if European governments did not renew the financial

incentive programs, which was unknown and uncertain during the Relevant Period, the

Company's European revenues would plummet.  Fourth, that as a result of the aforementioned

factors the Company's reported and projected financial information was false and misleading.

Fifth, as a result of the slowdown in orders from GCL Solar, the start-up of Satcon's Asian

manufacturing facility would likely be delayed.

73.     On April 7, 2011, Satcon announced its preliminary financial results for the first

quarter of 2011, for the period ending March 31, 2011.  Satcon expected first quarter revenues

between $61 and $63 million, which was below the forecasted range of $65 to $70 million.

Additionally, the Company expected gross margins between 23% and 25%, also below the

forecasted range of 25% to 27%.  Defendant Rhoades noted the following:

> ***While we are pleased our quarterly revenue has grown year over year, our Q1 2011 revenue reflects delays in construction projects.***  We continue to see significant year over year growth as a result of our diversified geographic strategy.  ***We expect the global environment to improve as we head into the peak construction season.*** When combined with demand trends in the US and Canada, as well as emerging new global markets, ***we continue to anticipate significant worldwide growth in 2011.***  [Emphasis added.]

Rhoades attributed the below-target preliminary results to customers delaying the delivery of

inverter systems initially targeted for March to later in the year and construction project delays.

74.     Following this announcement, Satcon's stock price fell $0.23 per share, a 7%

drop, closing at $3.29 per share.

75.     On April 27, 2011, the Company issued, and filed with the SEC, a press release

announcing its financial results for the first quarter of 2011, for the period ending March 31,

2011.  Satcon reported $62 million in revenues and $1.5 million in net operating loss.  Defendant

Rhoades stressed the positive aspects of the business by noting that Satcon's first quarter

performance "reflected continued demand for our utility scale solar PV systems in North

American and Asia." He did, however, concede that "[a]t the same time, ***our European business

was weaker than we expected due to the uncertainty around government policies for

renewable energy in several European countries***." Defendant Rhoades also announced that the

Company "expect[ed] Q2 revenue to be in the range of $50 to $60 million," and thus possibly

$10 million lower than the previous quarter's revenues.

76.     Satcon held a conference call to further discuss the Company's 2011 first fiscal

quarter results with analysts and investors.  Defendant Rhoades stated, contrary to his

representations on February 22, 2011, that the Company's bookings were much less than Satcon

enjoyed in the first quarter of prior fiscal years. Rhoades stated, in relevant part:

> While we're pleased with our first quarter growth over Q1 of last year, as we
> announced on April 7th our revenue for the quarter was below our initial
> projections of $65 million to $70 million. ***These lower than expected revenues
> were the result of a much weaker market in Europe than anticipated,*** as well as
> some shipments postponed to later in the year by our customers. Our gross margin
> for the quarter was 24%, below our initial projected range of 25% to 27% as a
> result of the lower than expected shipments we experienced in Q1. We ended the
> first quarter with a backlog of approximately $72.2 million, up 28% over our
> backlog of $56 million at March 31st, 2010.
>
> ***Bookings for the quarter were $35.5 million*** and equaled 132 megawatts of our
> inverter solutions. Our bookings performance in North America and Asia this
> quarter was consistent with our expectations, but ***Europe underperformed due to
> the combination of seasonality and the current uncertainty related to the feed-
> in-tariffs [i.e., government incentives] in the key markets of Germany and Italy***.
>
> Although the market situation in Europe remains unclear our diversified market
> approach positions us to expand our leadership positions in both North America
> and Asia, where we continue to be very competitive through a combination of our
> technology leadership and our ongoing focus to deliver the industry's highest
> performing solutions with the lowest levelized cost of energy.

77.    The statements in ¶¶73, 75, and 76 were misleading because they failed to

disclose four material facts.  First, the European governments' financial incentive programs,

which promoted solar energy, had largely expired. Second, Satcon's reported and projected

financial information was predicated upon expiring European government sponsored financial

incentive programs. Third, if European governments did not renew the financial incentive

programs, which was unknown and uncertain during the Relevant Period, the Company's

European revenues would plummet. Fourth, that as a result of the aforementioned factors the

Company's reported and projected financial information was false and misleading.

78.    Later in the same conference call, various analysts questioned Rhoades about the

health of Satcon's relationship with GCL Solar. Again, Rhoades gave no indication that the

manufacturing relationship was not proceeding as planned. The conference call included the

following exchanges:

> **<u>John Hardy, Analyst:</u>** Okay, and when you mentioned Asia I was wondering if
> you could ***give us an update on the GCL arrangement***? And also perhaps if you
> could let us know relative to your method of looking at backlog how much of the
> number you disclosed today, how much of that is GCL in your current backlog?
> That'd be great.

> **<u>Rhoades:</u>** I'm probably not going to give backlog on a specific customer, but I
> will say on the GCL arrangement ***we're continuing to work with GCL on the***
> ***manufacturing plant in Nanjing***. ***We said during our last call that that was***
> ***beginning to ramp-up in April***, and we are starting that, and that we were looking
> to have a significant activity with them as we closed out the third quarter of
> this year. So we continue to work with GCL, that our partnership with them remains
> strong, and we expect that to continue to be strong as we look into the back half of
> the year.

***

> **<u>Adam Krop, Analyst:</u>** Just a few follow-ups really. Number one, ***on the GCL***
> ***agreement*** when do you expect to get up to that 25 megawatts per month? I mean
> or 75 megawatts a quarter run rate? ***I know it sounds like you're ramping now***
> ***but when should we really expect that to come into play?***

> **<u>Rhoades:</u>** Yes, our plan is to have a significant portion of that in Q4 of this year.
> We're ramping through the next six months.

> **<u>Krop:</u>** So does that mean we should be modeling in the revenue to be coming
> from there or should we expect a little bit to show-up in Q3?

> **<u>Rhoades:</u>** I think that we'll see some in the third quarter, and we'll give you an
> update on that in the next call, but I think that that's, you know, to get to the
> higher volumes we're talking about we're looking at the fourth quarter of the
> year.

79. Defendant Rhoades' statements regarding the Company's relationship with GCL

Solar were misleading because Satcon was experiencing a reduction in orders from GCL Solar,

which in turn would delay the opening of the GCL Solar manufacturing facility.

80.     Following this announcement, Satcon's stock price dropped $0.19 per share, or 6%, closing at $3.00 per share. Nonetheless, the Company continued to issue misleading statements.

81.     On July 5, 2011, the Company issued a press release announcing its preliminary financial results for the second quarter of 2011, for the period ending June 30, 2011.  Satcon expected revenues of between $45 and $47 million and gross margin between 7% and 11%. The results for both metrics, however, fell below the Company's previous guidance.  Satcon again stressed the positive aspects of its business, noting that Satcon's second quarter performance included "important milestones on our path to long term margin expansion and profitability." The Company, however, conceded that it faced serious issues. The press release stated that "changes in government incentives in the Company's higher margin markets in Europe as well as delays on a few projects that have been pushed into the third quarter" were responsible for the below average financial results.

82.     Following this announcement, Satcon's stock fell $0.59 per share, or 23%, closing at $1.95 on heavy trading volume.

83.      The Company's misleading statements, omissions, and other wrongful conduct have caused its stock to fall precipitously. Satcon's stock fell 60% from the first time it disclosed the adverse factors on February 22, 2011 through July 5, 2011.

84.      As a result of Defendants' breaches of fiduciary duty and other misconduct, the price of the Company's stock has still not recovered.

85.      Accordingly, Satcon has been damaged.

86.      Moreover, as a result of the Individual Defendants' misconduct, the Company is now the subject of class action litigation alleging violation of the federal securities laws, which

necessitates the Company incurring wasteful costs and risks arising from the Individual Defendants' wrongful course of conduct.

## VI.     DERIVATIVE ALLEGATIONS

87.     Plaintiff brings this action derivatively on behalf of and for the benefit of Satcon to redress injuries suffered, and to be suffered, by it as a direct and proximate result of the breaches of fiduciary duties alleged herein. The Company is a nominal defendant named solely in a derivative capacity.

88.     Plaintiff purchased shares of Satcon and continued to hold such shares at all relevant times and through the present.  Thus, Plaintiff was a Satcon shareholder during the wrongdoing complained of herein.

89.     Plaintiff will fairly and adequately represent the interests of the Company, and has retained competent counsel experienced in derivative litigation to enforce and prosecute this action.

90.     The wrongful acts complained of herein subject, and will persist in subjecting Satcon, to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

## VII.    THE FUTILITY OF DEMAND

91.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

92.     At the time of the filing of this action, Satcon's Board of Directors is composed of seven (7) directors.

93.     Each of these directors has been named as a defendant in this action and was a director during the time period when Satcon is alleged to have artificially inflated its stock price

by issuing materially false and misleading statements in the Company's public filings, press releases, and conference calls.

94.     The Individual Defendants owed a duty to Satcon and its shareholders to be reasonably informed about the business and operations of the Company.   The Individual Defendants completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

95.     Plaintiff did not make a demand on the Company's Board prior to instituting this action because the wrongful acts complained of herein evidence a pattern of conduct showing a wholesale abandonment of their fiduciary duties, including the duty to exercise oversight, due care, and diligence.   Demand is excused because the Board has exhibited antipathy towards investigating or prosecuting corporate wrongdoing, in that it has, to date, failed to take any action in this regard.

96.     These acts, which demonstrate a pattern of misconduct, were not, nor could they have been, the product of a valid or good faith exercise of business judgment.

97.     Demand is excused because the Board must have known of the Company's manipulative actions relating to the issuance of materially false and materially misleading information to the public by means of SEC filings and press releases.

98.     Accordingly, the Board cannot exercise independent objective judgment in deciding whether to bring this action because they are personally interested in the outcome of this lawsuit as it is their actions that have subjected Satcon to liability.

99.     Additionally, Defendant Deutch, through his controlled entity NGP Energy Technology Partners, L.P., profited handsomely from the artificially inflated stock price as a direct result of the Company's false and misleading statements. On August 10, 2010, Deutch,

through his controlled entity, NGP Energy Technology Partners, L.P., sold 5,317,831 shares of

Satcon for a total price of $17,282,951.

100.    Further, any suit by the Company to remedy these wrongs would likely expose

the Individual Defendants and Satcon to further liability for violations of the federal securities

laws, in that it no doubt would result in additional civil actions being filed against one or more

of the Individual Defendants (and would further strengthen the existing civil litigation against

the Individual Defendants); thus, they are hopelessly conflicted in making any supposedly

independent determination of whether the Company should sue themselves.  Thus far, at least

two class action complaints for violations of the federal securities laws have been filed against

the Company as a result of the wrongdoing set forth herein.  In particular, an action entitled

*Edwards v. Satcon Tech. Corp., et al.* was filed in the United States District Court for the

District of Massachusetts on July 19, 2011, and an action entitled *Ziegler v. Satcon Tech.*

*Corp., et al.* was filed in the United States District Court for the District of Massachusetts on

July 21, 2011.

101.    Satcon has been, and will continue to be, exposed to significant losses due to the

wrongdoing complained of herein, yet the Board has not a lawsuit against itself or others who

were responsible for the wrongful conduct to attempt to recover for Satcon any part of the

damages the Company suffered and will suffer thereby.

102.    If the current directors were to cause the Company to bring this action against

themselves, they would thereby admit their own misconduct, which underlies allegations

contained in the class action complaints for violations of federal securities law, which

admissions would impair their defense of the class actions and greatly increase the probability

of their personal liability in the class actions, in an amount likely to be in excess of any

insurance coverage available to the Board.   Thus, the Board would be forced to take positions contrary to the defenses they will likely assert in the securities class action litigation.

103.     Despite the Board having knowledge of the facts underpinning the claims and causes of action raised by Plaintiff, the current Board has failed and refused to seek to recover for Satcon in connection with any of the wrongdoing alleged by Plaintiff herein.

104.     The conduct complained of herein could not have been the product of good faith business judgment, and each of the directors faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected Satcon to substantial damages.   Furthermore, the conduct of the Board has subjected the Company to substantial potential liability in connection with securities fraud class action litigation.   Through their misconduct, the Board has subjected the Company to a substantial risk of material costs, fines, and adverse judgments associated with the securities fraud class actions.   Such actions by the Board constitute waste and cannot be protected by the business judgment rule.   Accordingly, making a pre-suit demand on the Board would be futile.

## COUNT I

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY AND DISSEMINATING FALSE AND MISLEADING INFORMATION

105.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

106.     As alleged in detail herein, each of the Individual Defendants, as Directors of the Company, had a duty to ensure that Satcon disseminated accurate, truthful and complete information to its shareholders.

107.     The Individual Defendants violated their fiduciary duties of candor, care, loyalty, and good faith by causing the Company to disseminate to its shareholders materially misleading

and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

108.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered substantial damages.

## <u>COUNT II</u>

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY**

109.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

110.   The Individual Defendants owed and owe to Satcon fiduciary obligations.   By reason of their fiduciary relationships, the Individual Defendants specifically owed and continue to owe Satcon the highest obligations of good faith, fair dealing, loyalty and due care.

111.   The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

112.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Satcon has sustained substantial damages, not only monetarily, but also to its corporate image and goodwill.

113.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

114.   To the extent Plaintiff on behalf of Satcon seeks equitable relief, he has no adequate remedy at law.

## COUNT III

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL

115.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

116.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Satcon, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing Satcon to misrepresent material facts regarding its financial position and business prospects.

117.    As a direct and proximate result of the Individual Defendants' abuse of control, Satcon has sustained substantial damages.

118.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

119.    To the extent Plaintiff on behalf of Satcon seeks equitable relief, he has no adequate remedy at law.

## COUNT IV

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

120.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

121.    The Individual Defendants had a duty to Satcon and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Satcon.

122.    The Individual Defendants, by their actions including the wrongdoing described herein, abandoned and abdicated their fiduciary responsibilities and duties with regard to

prudently managing the businesses of Satcon in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Satcon's affairs and in the use and preservation of Satcon's assets.

123.    During the course of the discharge of their duties, the Individual Defendants knew or wrongfully disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Satcon to engage in the scheme complained of herein, which they knew had an unreasonable risk of damage to Satcon, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Satcon, thereby causing the Company to suffer substantial damages.

## COUNT V

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

124.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

125.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Satcon to incur (and likely to continue to incur) a significant risk of legal liability and legal costs to defend itself as a result of the Individual Defendants' wrongful actions.

126.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

127.    To the extent Plaintiff on behalf of Satcon seeks equitable relief, he has no adequate remedy at law.

## COUNT VI

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT

1.      Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

2.      By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Satcon.

3.      Plaintiff, as a shareholder and representative of Satcon, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from or in the course of their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.      Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Satcon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Satcon restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims set forth herein.

Dated:  August 6, 2012

/s/ Mitchell J. Matorin
Mitchell J. Matorin (BBO#649304)
Matorin Law Office, LLC
18 Grove Street
Suite 2
Wellesley, MA 02482
T: (781) 453-0100
F: (888) 628-6746
E: mmatorin@matorinlaw.com


LEVI & KORSINSKY, LLP
Nicholas Porritt
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*